Michael A. Sirignano
Barry I. Levy
Joseph Sulzbach
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General Insurance*
*Company, and GEICO Casualty Company*


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY COMPANY,<br><br>        Plaintiffs,<br><br>    -against-<br><br>PROMPT MEDICAL CARE, P.C.,<br>PEARL MEDICAL, P.C.,<br>IRENE MEDICAL, P.C.,<br>DA VINCI MEDICAL, P.C.,<br>RADIOLOGY OF NEW YORK, P.C.,<br><br>    -and-<br><br>ANDREW CORDARO, MD,<br>MILIVOJE MILOSEVIC, MD,<br>IRENE SCHULMAN, MD,<br>NEAL LISANN, MD,<br>SUNG UK KIM, MD,<br><br>    -and-<br><br>IGOR KALINITCHEV,<br>VICTOR RYAZANOV,<br>IK X-RAY SERVICES, INC.,<br>and JOHN DOES NOS. "1" through "10,"<br><br>        Defendants. | 15-cv-1744<br>Docket No.:_____( )<br><br><br>**Plaintiffs Demand a Trial by Jury** |

-------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF ACTION

1.      This action arises out of the Defendants' fraudulent submission of hundreds of thousands of dollars in healthcare charges to GEICO under New York's No-Fault Law. The Defendants' scheme herein involved billing GEICO for bogus x-ray charges generated by mobile vans and trucks that roamed between dozens of No-Fault clinics in Brooklyn, Queens and the Bronx, subjecting patients to alleged x-rays "curbside," without any oversight by a licensed medical physician and without compliance with the laws regulating radiation-producing equipment intended to protect public health.  To further the scheme, the Defendants billed for the x-rays using multiple corporate entities and physician-names in order to reduce the billing submitted through any single tax identification number, even though virtually all of the x-rays were submitted with purported interpretations from a single physician, Dr. Sung Uk Kim, who, not surprisingly, has a professional disciplinary record involving medical fraud.

2.      The Defendants' employed a two prong scheme to effectuate their fraud. First, unlicensed non-professionals bought the use of medical licenses of physicians to fraudulently incorporate and control numerous professional corporations or control the physicians' practices themselves. Then the unlicensed non-professionals used those fraudulently incorporated professional corporations and unlawfully controlled medical practices as "cover" to steal hundreds of thousands of dollars from GEICO through the submission of thousands of fraudulent charges for x-ray tests generated by the mobile x-ray units. The x-ray tests were supposedly

rendered for diagnostic purposes to individuals involved in automobile accidents who were eligible for No-Fault coverage under GEICO's insurance policies ("Insureds").

3. By this action, GEICO seeks (a) recovery of the more than $630,562 it paid out to the Defendants and (b) a declaration that it is not obligated to pay the more than $552,730 in pending fraudulent claims that the Defendants have submitted or caused to be submitted for the bogus x-rays. GEICO is entitled to both the recovery and the declaration because:

- the unlicensed non-professionals—in blatant violation of New York law—purchased the use of physicians' licenses for nominal sums or some ongoing payment, then used those licenses to fraudulently incorporate professional corporations or illegally control the physicians' practices;

- the unlicensed non-professionals bought the physicians' licenses with the sole intention of illegally profiting from the provision of healthcare services by submitting bills for x-ray services to GEICO and other New York insurers and, to that end, used the professional corporations, as well as the personal social security numbers of the physicians, as vehicles to drive the fraudulent bills to GEICO's door step;

- the professional corporations and the physicians' practices unlawfully split fees with the unlicensed non-professionals such that virtually all of the revenues were siphoned away to the unlicensed non-professionals;

- the professional corporations and the physicians' practices failed to comply with material licensing laws governing the registration and operation of the radiation-producing equipment used as part of their mobile x-ray practices; and

- in many cases, the x-ray services—to the extent they were provided at all—were provided by independent contractors, in violation of the No-Fault regulations.

4. The Defendants fall into the following categories:

- ***The Provider Defendants.*** Defendants Prompt Medical Services, P.C., Pearl Medical, P.C., Irene Medical, P.C., Da Vinci Medical, P.C., Radiology of New York, P.C., Milivoje Milosevic, and Andrew Cordaro are five New York medical professional corporations and two individuals through which the x-rays services purportedly were performed and billed to insurance companies, including GEICO.

- ***The Nominal Owner Defendants.*** Defendants Andrew Cordaro, Milivoje Milosevic, Irene Schulman, Neal Lisan, and Sung Uk Kim, are physicians licensed to practice medicine in the State of New York, who purportedly own the Provider Defendants, but who, in actuality, sold their name and licenses and/or allowed their professional corporations or practices to be controlled by non-physicians in violation of New York law.

- ***The Management Defendants.*** Defendants Igor Kalinitchev, Victor Ryazanov, IK X-Ray Services, Inc., and John Does "1" through "10," are persons and entities that are not and never have been licensed as physicians. Even so, they secretly and unlawfully owned, controlled, and derived economic benefit from the Provider Defendants and the Nominal Owner Defendants' practices, and engaged in illegal fee splitting relationships, in contravention of New York law.

5.     As discussed below, the Defendants, at all relevant times, have known that (i) the Provider Defendants were fraudulently incorporated, owned, and/or illegally controlled by unlicensed non-professionals and, therefore, were ineligible to bill for or to collect No-Fault benefits; (ii) the Provider Defendants unlawfully split fees with unlicensed non-professionals and, therefore, were ineligible to bill for or to collect No-Fault benefits; (iii) the Defendants engaged in unlawful kickback and payment for referral arrangements and, therefore, were ineligible to bill for or to collect No-Fault benefits; (iv) the Provider Defendants violated material licensing laws relating to the registration and operation of their mobile x-ray equipment; and (v) in many cases, the x-rays services—to the extent they were provided at all—were provided by independent contractors, rather than by the Provider Defendants' employees, in violation of the No-Fault regulations.

6.     As such, the Defendants do not now have—and never had—any right to be compensated for the x-rays services that were billed to GEICO through any of the Provider Defendants. The chart annexed hereto as Exhibits "1" through "7" sets forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO. The Defendants' fraudulent scheme began as early as 2009

and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $630,562.

## THE PARTIES

### I.     The Plaintiffs

7.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland.

8.     GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    The Defendants

#### A.    The Nominal Owner Defendants

9.     Defendant Andrew Cordaro ("Dr. Cordaro") is a physician who has been licensed to practice medicine in New York since January 7, 1977, and who serves as the nominal owner of Defendant Prompt Medical Services, P.C. Dr. Cordaro resides in and is a citizen of New York.

10.     Defendant Milivoje Milosevic ("Dr. Milosevic") is a physician who has been licensed to practice medicine in New York since October 24, 1980, and who serves as the nominal owner of Defendant Pearl Medical, P. C. Dr. Milosevic resides in and is a citizen of New York.

11.     Defendant Irene Schulman ("Dr. Schulman") is a physician who has been licensed to practice medicine in New York since July 31, 1986, and who serves as the nominal owner of Defendant Irene Medical, P.C. Dr. Schulman resides in and is a citizen of New York.

12.     Defendant Neal Lisann ("Dr. Lisann") is a physician who has been licensed to practice medicine in New York since October 1, 1982, and who serves as the nominal owner of

Defendant Da Vinci Medical, P.C. Dr. Lisann resides in and is a citizen of New York.

13.     Defendant Sung Uk Kim ("Dr. Kim") is a physician who has been licensed to practice medicine in New York since May 4, 1970, and who serves as the nominal owner of Defendant Radiology of New York, P.C. Dr. Kim resides in and is a citizen of New York.

14.     Dr. Kim, in addition to being the listed owner of Radiology of New York, P.C., purportedly interpreted the x-rays performed on Insureds in the mobile van and truck units that were billed under the names of each of the other Provider Defendants.

15.     Dr. Kim has a significant professional disciplinary record. In December 2003, the New York State Department of Health, State Board for Professional Medical Conduct determined that Dr. Kim had violated N.Y. Edu. Law § 6503(2) by practicing the profession of medicine fraudulently. Dr. Kim's license to practice medicine in New York was suspended for twenty-four months. In addition, as a result of Dr. Kim's New York suspension, the State of New Jersey suspended Dr. Kim's medical license for twenty-four months as well.

**B.    The Provider Defendants**

16.     Defendant Prompt Medical Services, P.C., ("Prompt Medical") is a New York medical professional corporation with its principal place of business in New York.

17.     Prompt Medical was fraudulently incorporated on or about September 16, 2013 and has been owned on paper by Dr. Cordaro, but in actuality has been owned and controlled by the Management Defendants in contravention of New York law.

18.     In addition to submitting charges through Prompt Medical, the Defendants also submitted, or caused to be submitted, charges through Dr. Cordaro's own personal social security number. This Complaint refers to the instances in which GEICO was billed through Dr. Cordaro's personal social security number for x-ray services that were part of the mobile testing

scheme as the Fraudulent Cordaro Practice. At all times, the Fraudulent Cordaro Practice has been owned and controlled by the Management Defendants in contravention of New York law.

19.   Defendant Pearl Medical, P.C. ("Pearl Medical") is a New York medical professional corporation with its principal place of business in New York.

20.   Pearl Medical was fraudulently incorporated on or about December 5, 2012 and has been owned on paper by Dr. Milosevic, but in actuality has been owned and controlled by the Management Defendants in contravention of New York law.

21.   In addition to submitting charges through Pearl Medical, Dr. Milosevic also submitted, or caused to be submitted, charges through his own personal social security number. This Complaint refers to the instances in which GEICO was billed through Dr. Milosevic's personal social security number for x-ray services that were part of the mobile testing scheme as the Fraudulent Milosevic Practice. At all times, the Fraudulent Milosevic Practice has been owned and controlled by the Management Defendants in contravention of New York law.

22.   Defendant Irene Medical, P.C., ("Irene Medical") is a New York medical professional corporation with its principal place of business in New York.

23.   Irene Medical was fraudulently incorporated on or about August 9, 2013 and has been owned on paper by Dr. Schulman, but in actuality has been owned and controlled by the Management Defendants in contravention of New York law.

24.   Defendant Da Vinci Medical, P.C., ("Da Vinci Medical") is a New York medical professional corporation with its principal place of business in New York.

25.   Da Vinci Medical was fraudulently incorporated on or about February 7, 2013 and has been owned on paper by Dr. Lisann, but in actuality has been owned and controlled by the Management Defendants in contravention of New York law.

26.     Defendant Radiology of New York, P.C. ("Radiology of NY") is a New York medical professional corporation with its principal place of business in New York.

27.     Radiology of NY was fraudulently incorporated on or about April 12, 2005 and has been owned on paper by Dr. Kim, but in actuality has been owned and controlled by the Management Defendants in contravention of New York law.

### C.     The Management Defendants

28.     Defendant Igor Kalinitchev ("Kalinitchev") resides in and is a citizen of New York, and Kalinitchev never has been a licensed physician or medical professional.

29.     Kalinitchev, though he has never has been a licensed physician or medical professional, secretly owns, controls, and derives economic benefit from the operation of the Provider Defendants, and engaged in illegal fee splitting arrangements, in contravention of New York law.

30.     Kalinitchev owns and controls Defendant IK X-Ray Services, Inc.

31.     Defendant Victor Ryazanov ("Ryazanov") resides in and is a citizen of New York, and Ryazanov never has been a licensed physician or medical professional.

32.     Ryazanov, though he has never been a licensed physician or medical professional, secretly owns, controls, and derives economic benefit from the operation of the Provider Defendants, and engaged in illegal fee splitting arrangements, in contravention of New York law.

33.     Defendant IK X-Ray Services, Inc. ("IK X-Ray") was a New York corporation, owned by Kalinitchev, that was incorporated on or about July 21, 2008 and later dissolved on or about June 10, 2013.

34.     While it was incorporated, IK X-Ray was used to illegally own, control, and derive economic benefit from the operation of Pearl Medical, Radiology of NY, and Da Vinci

Medical.

35.     In addition, even though IK X-Ray was dissolved in 2013, it was nonetheless still being used to illegally own, control, and derive economic benefit from the operation of the Fraudulent Milosevic Practice and the Fraudulent Cordaro Practice, as well as still is being used to illegally own, control, and derive economic benefit from the operation of Prompt Medical and Irene Medical.

36.     Defendants John Does "1" through "10" are additional individuals and entities whose names are not yet known to GEICO who conspired to and did assist in the fraudulent and unlawful scheme alleged in this Complaint, including but not limited to secretly owning, controlling, and deriving economic benefit from the operation of the Provider Defendants, and engaging in illegal fee splitting arrangements, in contravention of New York law.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

38.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

39.     GEICO underwrites automobile insurance in New York.

40.     New York's No-Fault Laws are designed to ensure that injured victims of motor

vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, *et seq.*) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, *et seq.*) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault benefits") to Insureds.

41.     No-Fault benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

42.     An Insured can assign his or her right to No-Fault benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services by using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

43.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault benefits if they were fraudulently incorporated. In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a professional corporation authorized to practice medicine; (iii) employ or supervise other physicians; and (iv) derive economic benefit from physician services. Hence, in New York, unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a professional corporation authorized to practice medicine; (iii) employ or supervise physicians; or (iv) derive economic benefit from physician services.

44.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet **any** applicable New York State or local licensing requirement necessary to perform such service in New York . . . . (emphasis added)

45.     In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals, by affirmatively reinforcing the Superintendent of Insurance's implementing regulation 11 N.Y.C.R.R. § 65-3.16(a)(12), made clear that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault benefits. The Court of Appeals further provided that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

46.     Pursuant to New York Education Law, healthcare providers are not eligible to receive No-Fault benefits if they engage in fee-splitting or kickback arrangements with unlicensed individuals, entities, or any person not a partner, employee, or associate within the healthcare provider. N.Y. EDUC. LAW § 6530.

47.     Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed. Under the No-Fault Laws, professional corporations are not eligible to receive No-Fault benefits if they are owned by physicians who do not engage in the practice of medicine through the professional corporation.

48.     Pursuant to the No-Fault Laws, only healthcare providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault benefits. There is both a statutory and regulatory prohibition against payment of No-Fault benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the

Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss . . . *directly* to the applicant or, . . . upon assignment by the applicant . . . shall pay benefits *directly* to providers of health[care] services as covered under section five thousand one hundred two (a)(1) of the Insurance Law . . . . (emphasis added)

49.     For a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation, such as independent contractors.

50.     Pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare provider to GEICO and all other insurers must be verified by the healthcare provider subject to—in substance—the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime . . . .

## II.     The Radiation Equipment Licensing Laws

51.     The New York State Department of Health regulates radiation equipment located within the state and requires that such equipment be registered with the Department or by an alternative agency, such as the New York City Department of Health.   In particular, 10 N.Y.C.R.R. § 16.50, provides that:

> [N]o person shall establish, maintain or operate any radiation installation at which is located or used any radiation equipment in operable condition or intended to be used, unless such installation has been registered as evidenced by a current certificate of registration issued to the operator thereof by the department or has been registered in an alternate manner accepted by the department.

52.     New York State law requires, pursuant to 10 N.Y.C.R.R. §16.6, that no person shall operate or permit the operation of radiation-producing equipment, such as x-ray machines, unless that person, *inter alia*, (i) develops, documents, and implements a radiation protection program; (ii) provides a radiation safety officer; (iii) provides a quality assurance program; and (iv) ensures that all personnel involved in planning for or administrating radiation doses to humans are supervised, are competent, and are instructed to safely use such radiation equipment.

53.     The New York State Department of Health publishes guidelines that describe the type and extent of information and standards by which the New York State Department of Health will evaluate a facility's Radiation Safety/Quality Assurance Program.

54.     The New York City Department of Health and Mental Hygiene regulates radiation equipment located within the five boroughs that is used for patient diagnosis or treatment.

55.     The City of New York, pursuant to Article 175 of the Rules of the City of New York, requires that, prior to establishing, maintaining, or operating any radiation installation at which is located any radiation equipment in operable condition, or prior to installing such equipment which is intended to be used, the owner or operator of such installation shall have obtained a current certificate of registration. R.C.N.Y. §175.51(b).

56.     Pursuant to Article 175, a certificate of registration shall not be issued to anyone other than natural persons who shall be responsible for the use and operation of the equipment and shall be liable for violations of the conditions of the registration or the provisions of Article 175. *Id.* §175.51(b)(2).

57.     Pursuant to Article 175, a certificate of registration shall not be transferrable or assignable. *Id.* §175.51(j).

58.     Pursuant to Article 175, no one shall apply x-rays to treat or diagnose any patient's medical condition at a facility that does not possess a current, non-expired certificate of registration from the New York City Department of Health and Mental Hygiene. *Id.* §175.51(d)(1).

59.     Pursuant to Article 175, no person shall sell, lease, transfer, lend or install any radiation-producing equipment, or the supplies used in connection with such equipment, unless such supplies or equipment when properly placed into operation or properly used will meet all of the requirements set forth in Article 175. *Id.* §175.53(b)(3).

## III.     <u>The Fraudulent Scheme</u>

60.     The Management Defendants—who are forbidden by law from owning, controlling, or receiving economic benefits from medical professional services because they are unlicensed non-professionals—carefully exploited the No-Fault Laws to do just that. Indeed, to elicit monies from GEICO for which they were legally barred from procuring, the Management Defendants concocted an elaborate fraudulent scheme that involved (i) the secret purchase of the Nominal Owner Defendants' licenses, (ii) the manipulation of those licenses so that the Management Defendants could own and control the Provider Defendants, and (iii) the use of the Provider Defendants as conduits to submit fraudulent No-Fault billing to the New York automobile insurance industry for x-ray services without compliance with the New York State and New York City licensing laws governing radiation-producing equipment.

61.     The Management Defendants did not use just one Nominal Owner Defendant or just one Provider Defendant to perpetrate their fraud. Rather, in an effort to extend their fraudulent scheme, the Management Defendants billed GEICO for the x-rays using five tax identification numbers and two social security numbers—*i.e.*, the seven Provider Defendants—to

avoid detection and to continue the flow of profits from the fraudulent scheme.

62.     The Defendants made substantial efforts to conceal the scheme and make it appear that the Provider Defendants each were a legitimate, separately owned "practice." But the Defendants all used the same game plan of having "mobile" x-ray equipment loaded on old vans or trucks that traveled to medical clinics in Brooklyn, Queens, and the Bronx that catered almost exclusively to No-Fault patients; had the vans or trucks park outside the clinics where patients from the clinics were led into the vehicles and subjected to x-rays without supervision by the Nominal Owner Defendants or in compliance with health and safety regulations governing radiation producing equipment; used the same reading radiologist to interpret the x-rays billed under the names of the purportedly separately-owned Provider Defendants; used the same outdated vans or trucks for many of the Provider Defendants; used identical (or very similar) treatment forms for the Provider Defendants; and totally controlled the billing and collection for all of the Provider Defendants by using the same billing company for the Provider Defendants, with the only one exception being the first entity used in the scheme under the name of Dr. Kim.

63.     The Management Defendants controlled and directed the scheme by: (i) orchestrating the fraudulent incorporation of the professional corporations or fraudulent control of the physicians' social security numbers; (ii) generating the referrals from the medical clinics that the vans or trucks visited by paying illegal referral fees and kickbacks to the healthcare providers that operated out of the clinics; (iii) hiring and directing the technicians to operate the x-ray machines; (iv) dispatching the vans and trucks to whatever location they directed; and (v) making the arrangements to have the x-rays interpreted (or allegedly interpreted) so that the reports, along with bills, for the bogus services could be sent to New York insurance companies.

64.     While the Nominal Owners purported to be the sole shareholder of the professional

corporations listed under their name, or purported to be in control of their "practices," they (i) did not invest any "start-up" or "acquisition" monies out of their own pocket to create and/or maintain the "practices;" (ii) did nothing to draw business, develop the referral base, or attract patients to the Provider Defendants; and (iii) did virtually nothing at all with respect to the mobile x-ray "practices," except loan their names and medical licenses to the Management Defendants.

65.     Indeed, the Management Defendants truly owned and controlled the Provider Defendants and they alone generated the referrals and receipt of a steady supply of patients on whom to perform the x-rays by paying illegal referral fees and kickbacks to the healthcare providers that operated out of the clinics.

66.     The ownership and control of the Provider Defendants by the Management Defendants endangered patients and resulted in unnecessary and excessive testing and billing, as the provision of health services by the Provider Defendants was (i) not in compliance with health and safety regulations pertaining to radiation-producing equipment and (ii) subject to the control and pecuniary interests of unlicensed non-professionals as opposed to the independent medical judgment of true physicians.

67.     In fact, the lack of true ownership and control of the Provider Defendants by the Nominal Owner Defendants—or any licensed physician—raises serious issues regarding the legitimacy and safety of the services that were performed, as well as the billing for such services.

68.     For example, Ground Rule 7 of the Fee Schedule regarding "Radiology" provides as follows:

> When a patient is referred to radiologists or other specialists for services covered in the Radiology section, they shall evaluate the patient's problem and determine if the services or procedures are medically necessary. Such evaluation and necessary consultation with the referring physician is an integral part of the professional component relative value unit and does not merit any additional charges.

69.     When a patient was referred to the Provider Defendants for radiology services, however, no medical doctor associated with the Provider Defendants evaluated the patient's problem to determine if the services or procedures were medically necessary; no consultation with the referring physician was performed; and no doctor from the Provider Defendants was present to supervise the technicians that performed the x-rays requested by other healthcare providers.

70.     New York State law also requires that, for professional practitioners in private practice, the individual professional (not his or her professional corporation) is responsible for the use and operation of the radiation equipment, including the development of a radiation protection program, establishment of a radiation safety officer, implementation of a quality assurance program, and the supervision of all personnel involved in planning for or administrating radiation doses to humans.  The published radiation safety and quality assurance guidelines used by the New York State Department of Health are particularly stringent for medical facilities, like Prompt Medical, that perform more than 2,500 diagnostic radiographic examinations each year.

71.     When a patient was referred to the Provider Defendants for radiology services, however, no medical doctor associated with the Provider Defendants took responsibility for the use and operation of the radiation equipment in accordance with the regulatory requirements.  In fact, none of the Provider Defendants had proper radiation protection programs, radiation safety officers, or quality assurance programs—subjecting both patients and the Provider Defendants' personnel to health and safety risks.

A. **The Management Defendants**

    (i)   <u>The Management Defendants' Illicit Control and Operation of the Provider Defendants</u>

72.    The Management Defendants controlled every aspect of the Provider Defendants. By virtue of this control, the Management Defendants directed the provision of the x-rays pursuant to a pre-determined protocol, solely to maximize the billing submitted to insurers and thereby increase the profits available to be siphoned off by them. Under the direction and control of the Management Defendants, the Provider Defendants billed insurers for the x-rays.

73.    To conceal their true ownership and control of the Provider Defendants while at the same time effectuating pervasive, total control over the Provider Defendants' operation and management, the Management Defendants caused the Nominal Owner Defendants and the Provider Defendants to enter into various agreements or financial arrangements with the Management Defendants and arranged to have the x-rays billed through the Provider Defendants.

74.    These agreements and financial arrangements called for exorbitant payments from the Provider Defendants for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and/or collections regardless of the actual value of the services that were provided.

75.    For example, all of the Provider Defendants, except Radiology of New York, used the same billing company (B & C) for billing and collection services, pursuant to the dictates of the Management Defendants.

76.    The Management Defendants also forced Pearl Medical, Da Vinci Medical, Irene Medical, Prompt Medical, the Fraudulent Milosevic Practice, and the Fraudulent Cordaro Practice to pay exorbitant fees to Radiology of NY, which was the first entity used by the Management Defendants to launch the fraudulent scheme. These fees were supposedly for

-18-

simplistic services like storing x-rays and Ryazanov's use of the support staff at the office of Radiology of NY.

77.     By forcing the Provider Defendants to enter into the various agreements and financial arrangements that called for exorbitant payments, the Management Defendants ensured that: (i) the Provider Defendants remained in constant debt to the Management Defendants; (ii) the Management Defendants could completely own the Provider Defendants as well as control their day-to-day operations; (iii) the Management Defendants could exercise total supervisory authority over the Provider Defendants; and (iv) the Management Defendants could siphon off all of the revenues that were generated by the billing submitted to GEICO and other insurers through the Provider Defendants.

78.     Throughout the course of the Nominal Owner Defendants' relationship with the Management Defendants, the Nominal Owner Defendants have exercised absolutely no control over, or had any genuine ownership interest in, the Provider Defendants. At all times the decision-making authority relating to the operation and management of the Provider Defendants has been vested entirely with the Management Defendants.

79.     For example, at a 2014 Examination Under Oath ("EUO"), Dr. Cordaro gave testimony indicating that Ryazanov, one of the Management Defendants, controlled every aspect of Prompt Medical, Pearl Medical, the Fraudulent Milosevic Practice, and the Fraudulent Cordaro Practice: Ryazanov coordinated the vans, Ryazanov scheduled the clinic visits during which the x-rays were performed, Ryazanov generated the patient referrals, Ryazanov chose to use B & C for the billing services, Ryazanov picked Dr. Kim to read the x-rays, and Ryazanov controlled when, where, and how the mobile x-ray units were maintained.  Dr. Cordaro also gave testimony indicating that Ryazanov physically worked out of, at one time or another, each of the

offices of Prompt Medical, Pearl Medical, the Fraudulent Milosevic Practice, the Fraudulent Cordaro Practice, and Radiology of NY.

80.     At that EUO, Dr. Cordaro's testimony further indicated that he did not practice medicine in any capacity and otherwise did virtually nothing as the purported "owner" of Prompt Medical and the Fraudulent Cordaro Practice, beyond lending his name and professional license to the scheme, and that he was unfamiliar with his responsibilities for overseeing radiation safety and for assuring that the mobile x-ray "practice" was properly registered and in compliance with health and safety regulations.

81.     Further, following his EUO, Dr. Cordaro submitted certain documentary materials to GEICO that completely contradicted his testimony. For example, Dr. Cordaro testified that only himself, the MRI technicians, Dr. Kim, and Ryazanov were employees of Prompt Medical. But the documents provided confirmed that one of the Management Defendants, Kalinitchev—who is also the owner of Management Defendant IK X-Ray—is a purported W-2 employee of Prompt Medical. Additionally, though Dr. Cordaro testified that Prompt Medical owned the x-ray equipment, the documents demonstrated that IK X-Ray, not Prompt Medical, was invoiced for numerous repairs made to the mobile x-ray units as if the equipment was owned by IK-X-ray. These payments occurred nine months after Kalinitchev supposedly dissolved IK X-Ray.

82.     In a 2013 lawsuit filed in the Eastern District of New York, IK X-Ray and Kalinitchev admitted to being "the owners and operators of a Mobile X-RAY business . . . ." *Paskhalny v. IK X-Ray Serv. Inc.*, 13-cv-01011 (RER), Compl. at *2, An. at *2 (E.D.N.Y. 2013).

83.     Public records also confirm that IK X-Ray and Kalinitchev held title to the mobile x-ray vans—VIN 1FDWE35L6YHB31300 and VIN 2GBJG31M5H4105445—used by most, if

not all, of the Provider Defendants to conduct the fraudulent scheme at one time.

84.     Additionally, on September 19, 2013—two months into the period in which Dr. Cordaro testified at his EUO that Prompt Medical was rendering services—Wilfred Okine, Prompt Medical's purported employee, told a National Insurance Crime Bureau investigator that he worked for Pearl Medical (and not Prompt Medical) and that Pearl Medical was owned by a man named Victor with a Russian last name (*i.e.*, Victor Ryazanov).

85.     The Nominal Owner Defendants have never truly controlled or maintained any of the Provider Defendants' books or records, never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of the Provider Defendants' financial affairs; never hired or supervised any of the Provider Defendants' employees; and were unaware of many of the most fundamental aspects of how the Provider Defendants operated.

86.     In addition to controlling the operations, finances, and management of the Provider Defendants, the Management Defendants established, supervised, and controlled the referral arrangements with the clinics, the treatment and billing protocols, and ultimately the provision of the healthcare services rendered under the name of each of the Provider Defendants. Indeed, at Dr. Cordaro's EUO, he gave testimony indicating that Ryazanov coordinates the schedules with the clinics, as well as solicits other clinics to refer patients to the Provider Defendants.

(ii)     The Management Defendants' Close Ties with Known Fraudsters

87.     The location, *2470 East 16th Street, Brooklyn, NY 11235* (the "East 16th Street address"), is the epicenter of the Defendants' fraud. To illustrate:

- Before it was dissolved in June 2013, the headquarters of Management Defendant IK X-Ray was located at the East 16th Street address;

- Kalinitchev and Ryazanov each operated out of the East 16th Street address;

-21-

- At least one of the mobile x-ray vans used by the Provider Defendants has been identified at the East 16th Street address;

- Pearl Medical and the Fraudulent Milosevic Practice operated from the East 16th Street address;

- Pearl Medical and the Fraudulent Milosevic Practice purportedly treated numerous Insureds at the East 16th Street address;

- Dr. Milosevic represented to the City of New York in his application for a certificate of registration that his premises was the East 16th Street address;

- Bills for repairs made to Prompt Medical's mobile x-ray van were sent to IK X-Ray at the East 16th Street address; and

- Prompt Medical stores its mobile x-ray equipment in Gabriella Volshteyn's office at the East 16th Street address.

88. The East 16th Street address is a one story building with a large awning overhanging the sole entrance, with the name "Law Offices of Gabriella Volshteyn" on the awning, but nothing more.

89. The Law Offices of Gabriella Volshteyn and the East 16th Street address have been associated with multiple, publicly reported fraud schemes.

90. Currently, the East 16th Street address and Gabriella Volshteyn are at the center of a $230 million tax fraud prosecution brought by the United States Attorney for the Southern District of New York. *See United States v. Prevezon Holdings LTD., et al.*, 13-CV-06326 (TPG) (S.D.N.Y.) In that case, it is alleged that a Russian criminal organization defrauded Russian taxpayers of hundreds of millions of dollars. The monies stolen from the Russian taxpayers reportedly made their way to the United States and were transferred from numerous accounts in Russia to the following companies: Prevezon Holdings LTD, Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810, LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA,

LLC (collectively the "Prevezon Companies").

91.     Gabriella Volshteyn and the East 16th Street address are closely tied with the Prevezon Companies:  (i) five of the Prevezon Companies list their New York State Department of State Service of Process Address as the East 16th Street address, while another listed the East 16th Street address as its actual address; and (ii) Gabriella Volshteyn, the lawyer who holds Prompt Medical's x-ray equipment, is named as an Authorized Person permitted to act on behalf of each of the Prevezon Companies and is also a member/owner of Prevezon Alexander, LLC.

92.     Not surprisingly, IK X-Ray was incorporated by the same entity that incorporated the Prevezon Companies (*e.g.*, Alexander Almonte, Esq., P.C.)

93.     In addition to the tax fraud scheme, Gabriella Volshteyn and the East 16th Street address were involved in a Medicare fraud prosecution brought by the United States Attorney for the Eastern District of New York. *See United States v. Gustave Drivas, et al.*, 10-CR-771 (NG) (E.D.N.Y. 2013). Gabriella Volshteyn's part in that case reportedly arose from her incorporation of three companies, at the East 16th Street address, that were used to siphon off millions of dollars in Medicare reimbursement initially paid to medical entities.

94.     The association of IK X-Ray, Kalinitchev, Ryazanov and the mobile x-ray business with the East 16th Street address is, thus, not surprising.

**B.      The Fraudulent Incorporation of the Provider Defendants**

(i)      The Fraudulent Incorporation and Operation of Radiology of NY

95.     As discussed above, the Defendants' fraudulent scheme involved, among other things, using the Nominal Owner Defendants' names and licenses to control a series of medical providers, which the Management Defendants used to bill GEICO for hundreds of thousands of dollars that Defendants were barred from receiving. The initial medical professional corporation

in this series of professional corporations was listed under Dr. Kim's name as Radiology of NY.

96.     Dr. Kim had incorporated Radiology of NY back in 2005. Thereafter, the professional corporation essentially became dormant, until the Management Defendants entered into a secrete scheme with Dr. Kim in which Dr. Kim sold his medical license to the Management Defendants and permitted them to control Radiology of NY.

97.     Dr. Kim was amendable to the Management Defendants' offer, inasmuch as Dr. Kim had attended a foreign medical school and had his license to practice suspended; thus limiting his prospects for highly-remunerative medical employment.

98.     In or around 2009, in order to circumvent New York law and to induce the State Education Department to continue to recognize Radiology of NY as a physician-owned and controlled professional corporation, Dr. Kim, in exchange for a designated salary or other form of compensation from the Management Defendants, agreed to continue to represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of Radiology of NY and that he continued to truly own, control and practice through the professional corporation. Dr. Kim did this knowing that Radiology of NY would be used to submit fraudulent billing to insurers.

99.     Soon thereafter, Dr. Kim ceded true ownership and control over the professional corporation to the Management Defendants. The Management Defendants caused the professional corporation to begin operating a mobile x-ray business throughout the New York Metro area.

100.     Dr. Kim has never been the true shareholder, director, or officer of Radiology of NY, and has never had any true ownership interest in or control over the professional

corporation. True ownership and control over Radiology of NY has rested at all times entirely with the Management Defendants, who used the facade of Radiology of NY to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

101.    The Management Defendants, rather than Dr. Kim, provided all capital and investment in Radiology of NY to allow it to operate a mobile x-ray business.

102.    Dr. Kim did not incur any costs to establish Radiology of NY's practice, nor did he invest any money in the professional corporation he purportedly owned to start up the mobile x-ray business operated under his professional corporation.

103.    Radiology of NY did not advertise or market its services to the general public.

104.    Radiology of NY did not use descript signage to the public indicating or advertising the name of Radiology of NY or Dr. Kim as the owner.

105.    Dr. Kim and Radiology of NY relied on the Management Defendants to generate patients.

106.    Dr. Kim did not hire or train any of the employees at Radiology of NY.

107.    Instead, the Management Defendants performed all of the hiring and supervision of medical, technical, and administrative personnel at Radiology of NY.

108.    Dr. Kim did not implement, oversee or control the efforts, if any, to comply with the licensing and safety regulations governing the operation of a mobile x-ray business using radiation-producing equipment.

109.    Dr. Kim, when a patient was referred to Radiology of NY, did not evaluate the patient's problem and determine if the services or procedures were medically necessary.

110.    Radiology of NY was simply the "name" used by the Management Defendants to illegally operate a mobile x-ray business.

111.    In fact, the referral forms used by Radiology of NY were boilerplate and exactly the same, or virtually the same, as ones used by the other Provider Defendants.

112.    Furthermore, all of the Provider Defendants "employed" and used Dr. Kim to interpret the x-rays.

113.    From late 2009 until November 2012, the Management Defendants used Radiology of NY to operate their mobile x-ray business. Upon information and belief, the Management Defendants abandoned the mobile x-ray portion of Radiology of NY's business because the insurance industry noticed the improper billing and started denying Radiology of NY's bills.

114.    Because of Radiology of NY's inability to generate illicit profits through the operation of a mobile x-ray business, the Management Defendants moved that business to another professional corporation—Pearl Medical.

115.    But Radiology of NY's part in the fraudulent scheme was far from over.

116.    Dr. Kim interpreted virtually every Fraudulent Test performed by Pearl Medical, Da Vinci Medical, Irene Medical, Prompt Medical, the Fraudulent Milosevic Practice, and the Fraudulent Cordaro Practice.

117.    Furthermore, the Management Defendants forced the Provider Defendants to pay Radiology of NY, which was controlled by the Management Defendants themselves, exorbitant sums for what were actually low-cost services, such as storing x-ray films, maintaining x-ray films, and letting Ryazanov use Radiology of NY's office staff.

118.    At all times, Radiology of NY purported to be headquartered at 97-05 101st Ave,

Ozone Park, NY. This address houses a small medical office called "Open MRI." It says nothing of Radiology of NY. In addition to Radiology of NY, the location also houses Immediate Imaging, P.C. This professional corporation has been identified by the United States Government as being used in furtherance of an organized no-fault fraud ring.

(ii)    The Fraudulent Incorporation and Operation of Pearl Medical

119.    As another part of the scheme, in 2012, the Management Defendants recruited Dr. Milosevic who was willing to "sell" his medical license to the Management Defendants and permitted them to fraudulently incorporation Pearl Medical and use it to submit large-scale fraudulent billing to insurers.

120.    To circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Pearl Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Milosevic. In exchange for a designated salary or other form of compensation, in December 2012, Dr. Milosevic agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of Pearl Medical and that he truly owned, controlled and practiced through the professional corporation. Dr. Milosevic did this knowing that Pearl Medical would be used to submit fraudulent billing to insurers.

121.    Soon thereafter, Dr. Milosevic ceded true ownership and control over the professional corporation to the Management Defendants. The Management Defendants caused the professional corporation to begin operating a mobile x-ray business throughout the New York Metro area.

122.    Dr. Milosevic has never been the true shareholder, director, or officer of Pearl

Medical, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over Pearl Medical has rested at all times entirely with the Management Defendants, who use the facade of Pearl Medical to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

123.    The Management Defendants, rather than Dr. Milosevic, provided all startup costs and investment in Pearl Medical.

124.    Dr. Milosevic did not incur any costs to establish Pearl Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

125.    Pearl Medical did not advertise or market its services to the general public.

126.    Pearl Medical's practice used no descript signage to the public indicating or advertising the name of Pearl Medical or Dr. Milosevic as the owner.

127.    Dr. Milosevic and Pearl Medical relied on the Management Defendants to generate patients.

128.    Dr. Milosevic also did not hire or train any of the employees at Pearl Medical. Instead, the Management Defendants performed all of the hiring and supervision of medical, technical, and administrative personnel at Pearl Medical.

129.    Dr. Milosevic did not implement, oversee or control the efforts, if any, to comply with the licensing and safety regulations governing the operation of the mobile x-ray business using radiation-producing equipment.

130.    Dr. Milosevic, when a patient was referred for x-ray services, did not evaluate the patient's problem and determine if the services or procedures are medically necessary, nor did he

consult with the referring physician.

131.    In fact, Dr. Milosevic's primary field of medicine is obstetrics and gynecology.

132.    Pearl Medical is simply another "name" used by the Management Defendants to operate a mobile x-ray business.

133.    Indeed, Pearl Medical began billing GEICO on November 15, 2012, almost a month prior to its date of incorporation.

134.    The referral forms used by Pearl Medical were boilerplate and the exact same ones, or virtually the same, as those used by the other Provider Defendants.

135.    Furthermore, Pearl Medical "employed" and used Dr. Kim to interpret the x-rays, as well as paid Radiology of NY (which was controlled by the Management Defendants) exorbitant sums for low-cost services, just like the other Provider Defendants.

136.    From late 2012 until May 2013, the Management Defendants used Pearl Medical to operate a mobile x-ray business. Upon information and belief, the Management Defendants abandoned Pearl Medical because the insurance industry noticed the improper billing and started denying Pearl Medical's bills.

137.    Once the Management Defendants learned that Pearl Medical could no longer generate illicit profits, the Management Defendants then started using the Fraudulent Milosevic Practice as the instrument it billed GEICO through.

138.    One month after the Management Defendants started billing GEICO through the Fraudulent Milosevic Practice, the Management Defendants set up a fictitious sale of Pearl Medical's assets (now being used by the Fraudulent Milosevic Practice) to Dr. Cordaro, as described below.

139.    As a part of this fictitious sale, Dr. Milosevic purportedly "transferred" his

certificate of registration—the document that enabled him to operate a mobile x-ray business—to Dr. Cordaro.

140.     The purported "transfer" of Dr. Milosevic's certificate of registration was a violation of Article 175 of the Rules of the City of New York for two reasons: *first*, a certificate of registration is not transferrable; *second*, because Dr. Cordaro does not have a certificate of registration himself, Dr. Milosevic transferred radiation equipment to an improper person, which is an express violation of Article 175.

(iii)     The Fraudulent Incorporation and Operation of Da Vinci Medical

141.     To expand the Defendants' scheme, in early 2013, the Management Defendants recruited Dr. Lisann who was willing to "sell" his medical license to the Management Defendants and permitted them to fraudulently incorporation Da Vinci Medical and use it to submit large-scale fraudulent billing to insurers.

142.     To circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Da Vinci Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Lisann. In exchange for a designated salary or other form of compensation, in February 2013, Dr. Lisann agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of Da Vinci Medical and that he truly owned, controlled and practiced through the professional corporation. Dr. Lisann did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

143.     Soon thereafter, Dr. Lisann ceded true ownership and control over the professional corporation to the Management Defendants. The Management Defendants caused

the professional corporation to begin operating a mobile x-ray business throughout the New York Metro area.

144.    Dr. Lisann has never been the true shareholder, director, or officer of Da Vinci Medical, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over Da Vinci Medical has rested at all times entirely with the Management Defendants, who used the facade of Da Vinci Medical to do indirectly what they were forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

145.    The Management Defendants, rather than Dr. Lisann, provided all startup costs and investment in Da Vinci Medical.

146.    Dr. Lisann did not incur any costs to establish Da Vinci Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

147.    Da Vinci Medical did not advertise or market its services to the general public.

148.    Da Vinci Medical's practice used no descript signage to the public indicating or advertising the name of Da Vinci Medical or Dr. Lisann as the owner.

149.    Dr. Lisann also did not hire or train any of the employees at Da Vinci Medical.

150.    The Management Defendants performed all of the hiring and supervision of medical, technical, and administrative personnel at Da Vinci Medical.

151.    Dr. Lisann did not implement, oversee or control the efforts, if any, to comply with the licensing and safety regulations governing the operation of a mobile x-ray business using radiation-producing equipment.

152.    Dr. Lisann, when a patient was referred for x-ray services, did not evaluate the

patient's problem and determine if the services or procedures were medically necessary, nor did he consult with the referring physician.

153.   Da Vinci Medical was simply another "name" used by the Management Defendants to illegally operate a mobile x-ray business.

154.   Indeed, though Da Vinci Medical was not incorporated until February 7, 2013, Defendants submitted billing for services allegedly provided before that date.

155.   Further, the referral forms used by Da Vinci were boilerplate and exactly the same, or virtually the same, as the ones used by the other Provider Defendants.

156.   Da Vinci Medical also "employed" and used Dr. Kim to interpret the x-rays, just like the other Provider Defendants.

157.   From January 2013 until August 2013, the Management Defendants used Da Vinci Medical to operate a mobile x-ray business. Upon information and belief, the Management Defendants abandoned Da Vinci Medical because the insurance industry noticed the improper billing and started denying Da Vinci Medical's bills.

(iv)   <u>The Fraudulent Incorporation and Operation of Irene Medical</u>

158.   To further expand the scheme, in 2013 the Management Defendants also recruited Dr. Schulman who was willing to "sell" her medical license to the Management Defendants and permitted them to fraudulently incorporation Irene Medical and use it to submit large-scale fraudulent billing to insurers.

159.   To circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Irene Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Schulman. In exchange for a designated salary or other form of compensation, in August 2013, Dr. Schulman agreed to falsely

represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Irene Medical and that she truly owned, controlled and practiced through the professional corporation. Dr. Schulman did this knowing that Irene Medical would be used to submit fraudulent billing to insurers.

160. Soon thereafter, Dr. Schulman ceded true ownership and control over the professional corporation to the Management Defendants. The Management Defendants caused the professional corporation to begin operating a mobile x-ray business throughout the New York Metro area.

161. Dr. Schulman has never been the true shareholder, director, or officer of Irene Medical, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over Irene Medical has rested at all times entirely with the Management Defendants, who used the facade of Irene Medical to do indirectly what they were forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

162. The Management Defendants, rather than Dr. Schulman, provided all startup costs and investment in Irene Medical.

163. Dr. Schulman did not incur any costs to establish Irene Medical's practice, nor did she invest any money in the professional corporation she purportedly owned.

164. Irene Medical did not advertise or market its services to the general public.

165. Irene Medical's practice used no descript signage to the public indicating or advertising the name of Irene Medical or Dr. Schulman as the owner.

166.    Dr. Schulman and Irene Medical relied on the Management Defendants to generate patients.

167.    Dr. Schulman also did not hire or train any of the employees at Irene Medical.

168.    The Management Defendants performed all of the hiring and supervision of medical, technical, and administrative personnel at Irene Medical.

169.    Dr. Schulman did not implement, oversee or control the efforts, if any, to comply with the licensing and safety regulations governing the operation of a mobile x-ray business using radiation-producing equipment.

170.    Dr. Schulman, when a patient was referred for x-ray services, did not evaluate the patient's problem and determine if the services or procedures were medically necessary, nor did she consult with the referring physician.

171.    Irene Medical was simply another "name" used by the Management Defendants to operate a mobile x-ray business.

172.    Indeed, the referral forms used by Irene Medical were boilerplate and exactly the same, or virtually the same, as the ones used by the other Provider Defendants.

173.    Furthermore, Irene Medical "employed" and used Dr. Kim to interpret the x-rays, just like the other Provider Defendants.

174.    From August 2013 until February 2014, the Management Defendants used Irene Medical to operate a mobile x-ray business. Upon information and belief, the Management Defendants abandoned Irene Medical because the insurance industry noticed the improper billing and started denying Irene Medical's bills.

(v)     The Fraudulent Incorporation and Operation of Prompt Medical

175.    In 2013, the Management Defendants also recruited Dr. Cordaro who was willing

-34-

to "sell" his medical license to the Management Defendants and permitted them to fraudulently incorporation Prompt Medical and use it to submit large-scale fraudulent billing to insurers.

176.    To circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Prompt Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Cordaro. In exchange for a designated salary or other form of compensation, in September 2013, Dr. Cordaro agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of Prompt Medical and that he truly owned, controlled and practiced through the professional corporation.  Dr. Cordaro did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

177.    The Management Defendants created Prompt Medical with the intention of transferring Pearl Medical's assets to Prompt Medical, so they could use Prompt Medical's clean name to bill insurance companies.

178.    To make the transfer from Pearl Medical to Prompt Medical appear legitimate, the Management Defendants setup a fictitious sale: Dr. Cordaro purportedly purchased most of Pearl Medical's assets from Dr. Milosevic, including Pearl Medical's two mobile x-ray vans, for fifty thousand dollars and then transferred those assets to Prompt Medical.

179.    This sale was controlled by the Management Defendants in every way. At his EUO, Dr. Cordaro gave testimony indicating that:

- he dealt almost exclusively with Ryazanov regarding the purchase of Pearl Medical's assets,

- he had no idea who created the purchase agreement,

-35-

- the closing consisted of Dr. Cordaro signing the purchase agreement alone and then Ryazanov supposedly taking it to Dr. Milosevic to sign,

- Dr. Cordaro did not review Pearl Medical's books and records,

- Dr. Cordaro did not even know if Pearl Medical was profitable, and

- Dr. Cordaro and his professional corporation began operating using Pearl Medical's assets even before Milosevic was paid any monies.

180.    In fact, Dr. Cordaro (through the Management Defendants) took possession of Pearl Medical's assets months before payment occurred. This early acquisition, orchestrated by the Management Defendants, allowed Dr. Cordaro to "purchase" the mobile x-ray practice without any investment of his own, instead using Pearl Medical's assets to generate the fifty thousand dollars necessary for the supposed "purchase" and pay-off of Dr. Milosevic for his participation in the scheme.

181.    Moreover, all of the underlying expenses associated with the operation of Pearl Medical's assets—like salaries, upkeep, and the very large payments to Radiology of NY—were not paid during the initial months when Dr. Cordaro was installed as the nominal owner, with all of the personnel reportedly willing to work for Dr. Cordaro as the new owner for free.

182.    The purchase by Dr. Cordaro, and the personnel's purported willingness to work for free, was plainly a sham, as the personnel were never truly under Dr. Cordaro's control, but were all controlled, directed, and managed by the Management Defendants.

183.    Accordingly, Dr. Cordaro did not incur any costs himself to establish Prompt Medical's practice, did not actually buy Pearl Medical's assets in an arms-length transaction, and was used as nothing more than a figure head to allow the Management Defendants to continue the fraudulent scheme under the name of a new nominal owner.

184.    For the first month after Dr. Cordaro purportedly acquired Pearl Medical's assets, the Management Defendants used the Fraudulent Cordaro Practice submit bills to GEICO. Thereafter, the Management Defendants used Prompt Medical.

185.    At all times, the Management Defendants exercised complete control over Prompt Medical and the Fraudulent Cordaro Practice. The Management Defendants caused Prompt Medical and the Fraudulent Cordaro Practice to operate a mobile x-ray business throughout the New York Metro area.

186.    The Management Defendants continue to control and direct Prompt Medical's business through the present.

187.    Dr. Cordaro has never been the true shareholder, director, or officer of Prompt Medical, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over Prompt Medical has rested at all times entirely with the Management Defendants, who used the facade of Prompt Medical to do indirectly what they were forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

188.    Prompt Medical did not advertise or market its services to the general public.

189.    Prompt Medical failed to describe Prompt Medical's practice by descript signage to the public indicating or advertising the name of Prompt Medical or Dr. Cordaro as the owner.

190.    Dr. Cordaro and Prompt Medical relied on the Management Defendants to generate patients.

191.    Dr. Cordaro also did not hire or train any of the employees at Prompt Medical.

192.    Instead, the Management Defendants performed all of the hiring and supervision

of medical, technical, and administrative personnel at Prompt Medical.

193.   Dr. Cordaro did not implement, oversee or control the efforts, if any, to comply with the licensing and safety regulations governing the operation of a mobile x-ray business using radiation-producing equipment.

194.   Dr. Cordaro, when a patient was referred for x-ray services, did not evaluate the patient's problem and determine if the services or procedures were medically necessary, nor did he consult with the referring physician.

195.   Prompt Medical was simply another "name" used by the Management Defendants to operate a mobile x-ray business.

196.   Indeed, Prompt Medical began billing GEICO on August 19, 2013, nearly a month prior to its date of incorporation.

197.   Further, the referral forms used by Prompt Medical were boilerplate and exactly the same, or virtually the same, as the ones used by the other Provider Defendants.

198.   Prompt Medical also "employed" and used Dr. Kim to interpret the x-rays, as well as paid Radiology of NY (which was controlled by the Management Defendants) exorbitant fees for low-cost services, just like the other Provider Defendants.

199.   In addition, Prompt Medical is illegally operating a mobile x-ray business. Pursuant to Article 175 of the Rules of the City of New York, prior to establishing, maintaining, or operating any business that will use radiation equipment, the owner or operator of the business must obtain a current certificate of registration. A certificate of registration can only be issued to the natural person who will be responsible for the use and operation of the radiation equipment. A certificate of registration cannot be transferred or assigned.

200.   Dr. Cordaro does not have a certificate of registration; he is thus illegally

operating a mobile x-ray business. Moreover, the fact that Dr. Milosevic purportedly assigned Dr. Cordaro a certificate of registration in the fictitious sale means nothing, as a certificate of registration is not assignable.

201.    Additionally, Ryazanov—an unlicensed nonprofessional with no training in radiation and no supervision or involvement by Dr. Cordaro—purportedly handles Prompt Medical's radiation safety issues.

**C.      The Fraudulent Billing For Independent Contracts**

202.    The Defendants' fraudulent scheme includes submission of billing to GEICO seeking payment for services provided by independent contractors. Under the No-Fault Laws, healthcare providers are ineligible to bill for or receive payment for services provided by independent contractors—the healthcare services must be provided by the providers themselves, or their employees.

203.    Since 2001, the New York State Department of Insurance (now the New York State Department of Financial Services) consistently has reaffirmed its longstanding position that healthcare providers are not entitled to receive reimbursement under the No-Fault Laws for healthcare professionals performing services as independent contractors. *See DOI Opinion Letter*, February 21, 2001 ("[W]here the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services . . . ."); *DOI Opinion Letter*, February 5, 2002 (refusing to modify position set forth in February 21, 2001 Opinion Letter despite a request from the New York State Medical Society); *DOI Opinion Letter*, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent

himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act . . . ."); *DOI Opinion Letter*, October 29, 2003 (extending the independent contractor rule to hospitals); *DOI Opinion Letter*, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). (Copies of these Opinion Letters are collectively annexed hereto as Exhibit "8.")

204. Not only did the Defendants routinely bill GEICO for the x-rays pursuant to a pre-determined, fraudulent treatment protocol directed by the Management Defendants, but the Defendants also—in nearly every case—billed for services that were performed by independent contractors, rather than by the Provider Defendants' employees.

205. At best, only the bills that were submitted to GEICO through Radiology of NY for x-rays actually interpreted by Dr. Kim potentially did not violate the prohibition because Dr. Kim nominally owns Radiology of NY.

206. Besides that, all of the x-rays that have been billed to GEICO through the Provider Defendants have been interpreted—to the extent that they have been interpreted at all—by Dr. Kim, who is not a direct, actual employee of the other Provider Defendants.

207. Even though the Provider Defendants claim that Dr. Kim has been an employee of each respective professional corporation and that Dr. Kim has been paid via a W-2, Dr. Kim has at all times been an independent contractor operating through Radiology of NY. The Defendants set up the employee/W-2 veil in an effort to cover up the true relationship and circumvent the No-Fault laws.

208. At all times, Dr. Kim has been treated by the Provider Defendants as an independent contractor.

209.    Dr. Kim at all times operated from his own office at 97-05 101st Ave, Ozone Park NY.

210.    Dr. Kim at all times worked interpreting x-ray services at times and amounts of his own choosing, without regard to any input from the Nominal Owners.

211.    The Nominal Owner Defendants and the Provider Defendants did not supervise, control, or directed the activity of Dr. Kim in reading (or purportedly) reading the x-rays.

212.    In fact, Dr. Kim had next to no contact with the Nominal Owner Defendants.

213.    Dr. Kim also worked interpreting x-rays and providing other radiology services for others, who had no connection to the Provider Defendants.

214.    Despite this, in the billing that the Defendants submitted or cause to be submitted to GEICO through the Provider Defendants, the Defendants routinely misrepresented Dr. Kim as an actual employee of the Provider Defendants.

215.    In actuality, the Defendants treated Dr. Kim as an independent contractor.

216.    Additionally, Dr. Kim ran at least two full-time professional corporations and worked for other healthcare providers, in addition to his supposed employment obligations with the Provider Defendants.

217.    Because every bill for the x-rays submitted to GEICO through Prompt Medical, Pearl Medical, Da Vinci Medical, Irene Medical, the Fraudulent Cordaro Practice, and the Fraudulent Milosevic Practice was interpreted by Dr. Kim, the Defendants did not have any right to bill for or collect No-Fault benefits in connection with those services.

## IV.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

218.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault benefits (*i.e.* NF-3 Forms) consistently have been submitted to GEICO by and on behalf of the

Provider Defendants seeking payment for services for which the Provider Defendants are ineligible to receive payment.

219.    The NF-3 Forms submitted to GEICO by the Defendants and on behalf of the Provider Defendants are false and misleading in the following material respects:

(i)     The NF-3 Forms uniformly misrepresented to GEICO that Radiology of NY, Pearl Medical, Da Vinci Medical, Irene Medical, and Prompt Medical were lawfully licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). Instead, these entities are not properly licensed in that they are professional corporations that were fraudulently incorporated and have been owned and controlled by the Management Defendants, who are not physicians.

(ii)    The NF-3 Forms uniformly misrepresented to GEICO that the Fraudulent Milosevic Practice and the Fraudulent Cordaro Practice were lawfully licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). Instead, the Fraudulent Milosevic Practice and the Fraudulent Cordaro Practice are not properly licensed in that they are medical practices that were fraudulently owned and controlled by the Management Defendants, who are not physicians.

(iii)   The NF-3 Forms uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). Instead, the Provider Defendants are not lawfully licensed in that they illegally split fees with unlicensed non-professionals.

(iv)    The NF-3 Forms uniformly misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the x-rays that were performed by alleged employees. Instead, in the vast majority of cases, the x-rays were not interpreted by the Provider Defendants' employees.

(v)     The NF-3 Forms uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). Instead, the Provider Defendants have been in material violation of licensing laws, in that they violated licensing laws relating to the registration and operation of a mobile x-ray business in New York State and New York City.

## V.      **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

220.    The Defendants legally and ethically are obligated to act honestly and with

-42-

integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

221.    To induce GEICO to promptly pay the fraudulent charges for the x-rays, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment by, among other things, engaging in inter-related schemes under the names of a myriad of ever-changing entities.

222.    The Defendants also knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that (i) Radiology of NY, Da Vinci Medical, Irene Medical, Pearl Medical, and Prompt Medical were unlawfully incorporated, owned, and controlled by unlicensed, non-professionals, and (ii) the Fraudulent Milosevic Practice and the Fraudulent Cordaro Practice were unlawfully owned and controlled by unlicensed, non-professionals. The Defendants also knowingly misrepresented and concealed facts in an effort to prevent discovery that the Provider Defendants paid illegal kickbacks and split fees and, therefore, are ineligible to bill for or collect No-Fault benefits. Additionally, the Defendants operated the Provider Defendants in a manner designed to—and in fact did—conceal the true ownership of the Provider Defendants.

223.    To this end, in every bill that the Defendants submitted or caused to be submitted, the Defendants knowingly misrepresented that the Provider Defendants were authorized and properly licensed to provide healthcare services in New York and thus eligible to bill for and collect No-Fault benefits, when in fact they were not.

224.    Also in every bill that the Defendants submitted or caused to be submitted, the Defendants knowingly misrepresented that the Provider Defendants were owned and controlled by healthcare professionals licensed to provide healthcare services in New York and thus eligible to bill for and collect No-Fault benefits, when in fact they were not.

225.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants derived patient referrals through kickbacks.

226.    The Defendants also knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants split fees with unlicensed non-professionals.

227.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the x-rays were performed pursuant to a fraudulent, pre-determined protocol directed by unlicensed non-professionals and designed to maximize the charges that can be submitted.

228.    Moreover, the Defendants knowingly misrepresented and concealed facts related to the employment status of Dr. Kim in order to prevent GEICO from discovering that Dr. Kim was not employed by Pearl Medical, Da Vinci Medical, Irene Medical, Prompt Medical, the Fraudulent Cordaro Practice, or the Fraudulent Milosevic Practice.

229.    The Defendants also knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Provider Defendants were in material violation of state licensing laws relating to the operation of practices involving radiation-producing equipment.

230.    What is more, the Defendants created and purported to practice through multiple healthcare providers with different names and tax identification numbers in order to intentionally cause confusion and reduce the amount of billing submitted through any single healthcare provider, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

231.    The Defendants hired, and continue to hire, law firms to pursue collection of the

-44-

fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

232.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty days. The facially valid, verified documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, have been designed to and has caused GEICO to rely upon them. As a result, GEICO has incurred damages of more than $630,562 based upon payments made by GEICO in reliance on the fraudulent charges that the Defendants submitted or caused to be submitted.

233.    GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

234.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely denied the pending claims for No-Fault benefits submitted through the Provider Defendants; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault benefits submitted through the Provider Defendants, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault benefits submitted through the Provider Defendants, or else to request additional verification of those claims, has not expired.

235.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have

discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment—28 U.S.C. §§ 2201 and 2202)**

236.    GEICO repeats and realleges each and every allegation set forth above as though fully set forth herein.

237.    There is an actual case in controversy between GEICO and the Defendants, regarding more than $552,730 in fraudulent billing for healthcare services that has been submitted to GEICO.

238.    Radiology of NY, Pearl Medical, Da Vinci Medical, Irene Medical, and Prompt Medical have no right to receive payment for any pending bills submitted to GEICO because they are fraudulently incorporated, not truly or solely owned by the Nominal Owner Defendants, and are instead owned and controlled by the Management Defendants, who are unlicensed non-professionals and, therefore, are ineligible to seek or recover No-Fault benefits.

239.    The Fraudulent Milosevic Practice and the Fraudulent Cordaro Practice have no right to receive payment for any pending bills submitted to GEICO because they are illegally owned and controlled by the Management Defendants, who are unlicensed non-professionals and, therefore, are ineligible to seek or recover No-Fault benefits.

240.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because they engaged in unlawful fee-splitting arrangements with persons and entities that are not licensed physicians, including the Management Defendants.

241.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because they violated material licensing laws governing healthcare practices that operate radiation-producing equipment.

-46-

242.   The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in the vast majority of cases, the x-rays have been interpreted—to the extent that they have been interpreted at all—by an independent contractor, rather than by the Provider Defendants' employees.

243.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)   the Defendants have no right to receive payment for any pending bills submitted to GEICO because Radiology of NY, Pearl Medical, Da Vinci Medical, Irene Medical, and Prompt Medical are fraudulently incorporated, are not truly or solely owned by the Nominal Owner Defendants, and instead are owned and/or controlled by the Management Defendants and, therefore, the Defendants are ineligible to seek or recover No-Fault benefits;

(ii)   the Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Milosevic Practice and the Fraudulent Cordaro Practice are unlawfully owned and controlled by the Management Defendants and, therefore, the Defendants are ineligible to seek or recover No-Fault benefits;

(iii)   the Defendants have no right to receive payment for any pending bills submitted to GEICO because the Defendants engaged in illegal fee-splitting arrangements with non-physicians in violation of New York law;

(iv)   the Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants violated material licensing laws governing healthcare practices that operate radiation-producing equipment; and

(v)   the Defendants have no right to receive payment because, in the vast majority of cases, the x-rays have been interpreted—to the extent they have been interpreted at all—by an independent contractor, rather than by the Provider Defendants' employees and, therefore, the Defendants are ineligible to bill for or collect No-Fault benefits for such tests.

### SECOND CAUSE OF ACTION
**Against All Defendants**
**(Common Law Fraud)**

244.   GEICO repeats and realleges each and every allegation set forth above as though

-47-

fully set forth herein.

245.    The Provider Defendants, the Nominal Owner Defendants, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the x-rays.

246.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Provider Defendants were properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they are fraudulently owned and illegally controlled by unlicensed non-professionals; (ii) in every claim, the representation that the Provider Defendants were properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they engage in illegal fee-splitting with unlicensed non-professionals; (iii) in every claim, the representation that the Provider Defendants were properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they paid kickbacks to healthcare clinics in order to generate patient referrals; (iv) in every claim, the representation that the Provider Defendants were properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they violated material licensing regulations governing healthcare practices that operate radiation-producing equipment; and (v) in every claim submitted by Prompt Medical, Pearl Medical, Irene Medical, Da Vinci Medical, the Fraudulent Cordaro Practice, and the Fraudulent Milosevic Practice, the representation that the billed-for services were interpreted by Prompt Medical's, Pearl Medical's, Irene Medical's, Da

Vinci Medical's, the Fraudulent Cordaro Practice's, and the Fraudulent Milosevic Practice's employees, when in fact the billed-for services were provided, to the extent they were provided at all, by an independent contractor.

247.   The Provider Defendants, the Nominal Owner Defendants, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Provider Defendants that are not compensable under the No-Fault Laws.

248.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $630,562 pursuant to the fraudulent bills submitted by the Defendants.

249.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

250.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

251.   GEICO repeats and realleges each and every allegation set forth above as though fully set forth herein.

252.   As set forth above, the Provider Defendants, the Nominal Owner Defendants, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

253.   When GEICO paid the bills and charges submitted by or on behalf of the Provider

Defendants for No-Fault benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

254.    The Provider Defendants, the Nominal Owner Defendants, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

255.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

256.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $630,562.

## JURY DEMAND

257.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company, demand that a Judgment be entered in their favor, as follows:

A.    On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $630,562, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.    On the Third Cause of Action against All Defendants, more than $630,562 for the

Defendants' unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper; and

D. For such other and further relief as the Court may deem just and proper.

Dated:   Uniondale, New York
         April ___, 2015

RIVKIN RADLER LLP

By: _____
    Michael A. Sirignano
    Barry I. Levy
    Joseph Sulzbach
    926 RXR Plaza
    Uniondale, New York 11556
    (516) 357-3000

    *Counsel for Plaintiffs, Government Employees*
    *Insurance Company, GEICO Indemnity*
    *Company, GEICO General Insurance*
    *Company, and GEICO Casualty Company*

3045732